UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY M. CONKLIN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE BANK OF NEW YORK MELLON | * |
| CORP. and BNY MELLON, N.A., | * |
| | * |
| Defendants. | |

Civil Action No. 1:24-cv-12301-IT

MEMORANDUM & ORDER

August 21, 2025

TALWANI, D.J.

Pending before the court is Defendants Bank of New York Mellon Corp. ("BNYM") and

BNY Mellon, N.A., d/b/a BNY Wealth Management's ("BNY Wealth") Motion to Dismiss

[Doc. No. 14] Plaintiff Jeffrey M. Conklin's Complaint [Doc. No. 1-2]. For the following

reasons, Defendants' Motion [Doc. No. 14] is DENIED as to Conklin's claim for breach of

contract against BNY Wealth for investing assets from his accounts ending in 9000, 9010, and

4000 in securities issued by BNYM, its subsidiaries, or its affiliates, and GRANTED as to

Conklin's remaining claims against BNY Wealth and as to all claims against BNYM.

I.     **Background**

A. *Facts as Alleged in the Complaint*

Jeffrey M. Conklin is a resident of Massachusetts. Compl. ¶ 1 [Doc. No. 1-2]. BNYM is

incorporated in Delaware and has a principal place of business in New York. Id. ¶ 2; Corporate

Disclosure Statement ¶ 3 [Doc. No. 23]. BNY Wealth is a national bank with its main office in

Pennsylvania. Compl. ¶ 3 [Doc. No. 1-2]; Corporate Disclosure Statement ¶¶ 5–6 [Doc. No.

23].[1] BNY Wealth is the "wealth management arm" and a subsidiary of BNYM. Compl. ¶ 6 [Doc. No. 1-2].

Conklin is a current and former customer of BNY Wealth. Id. ¶ 11. Conklin's banking relationship with Defendants started on or about January 2007. Id. ¶ 12. Conklin signed client agreements with BNY Wealth pursuant to which he entrusted Defendants to invest his assets. Id. ¶ 13. The banking relationship between Conklin and the Defendants (through BNY Wealth) included 15 accounts. See id. ¶ 18. Over time, Defendants have managed up to $25,000,000 of Conklin's monies, held in various capacities, with full investment authority with respect to those funds. Id. ¶ 17. Conklin's "client agreement" consisted of several multi-part agreements. Id. ¶ 84. Pursuant to the client agreements, BNY Wealth became the discretionary investment manager regarding the covered accounts. Id. ¶ 95; see also id. ¶ 92.

BNY Wealth used Conklin's assets to purchase consistently underperforming investment vehicles, including some in which BNY Wealth and BNYM had financial interests, from which BNY Wealth and its individual investment managers received commissions, fees, incentive payments or other compensation, and from which BNYM and its affiliates secured tens of thousands of dollars in fees and other compensation. Id. ¶ 51. For example, in the discretionary accounts BNY Wealth managed for Conklin, BNY Wealth purchased at least 27 affiliated funds managed by an affiliate of Defendants. Id. ¶¶ 148–49. BNYM and/or its affiliates received

---

[1] Conklin alleges that BNY Wealth has "a principal office" in Boston, Massachusetts. Compl. ¶ 3 [Doc. No. 1-2]. However, for purposes of diversity jurisdiction, a national bank is a citizen of the state where it is "located," 28 U.S.C. § 1348, which is "the State designated in its articles of association as its main office[.]" McKenna v. Wells Fargo Bank, N.A., 693 F.3d 207, 212 (1st Cir. 2012) (quoting Wachovia Bank, N.A. v. Schmidt, 546 U.S. 303, 318 (2006)). Here, BNY Wealth's articles of association designate Pennsylvania as the location of its main office. See Notice of Removal Ex. 3 2 [Doc. No. 1-4].

portions of the management fees with respect to transactions with these funds, and BNY Wealth received a commission/incentive payment for purchasing these affiliated funds. Id. ¶¶ 150–51. Further, Defendants used Conklin's assets to purchase investment vehicles that Defendants or their affiliates issued. Id. ¶ 54.

B. *The Agreements*

Conklin's 15 accounts with BNY Wealth include: two irrevocable trust accounts (with account numbers ending in 9000 and 9010), two residuary trust accounts (with account numbers ending 5302 and 4000), a line of credit (with an account number ending 6000), two adjustable rate mortgage ("ARM") accounts (with account numbers ending in 4936 and 6619), two revocable trust accounts (with account numbers ending in 3000 and 3020), two individual retirement accounts ("IRA") (with account numbers ending in 5000 and 7000), two checking accounts (with account numbers ending in 2280 and 0069), and two UTMA accounts. See id. ¶ 18.

Defendants have provided various Agreements between Conklin and BNY Wealth that govern these accounts. BNYM is not a party to any of these Agreements.

An Investment Management Agreement executed on July 20, 2018, covers Conklin's irrevocable trust accounts ending in 9000 and 9010. See Aframe Decl. Ex. 1 [Doc. No. 15-1]; Compl. ¶¶ 18(a)–(b) [Doc. No. 1-2]. A Private Banking New Account Agreement executed on August 10, 2018, covers Conklin's residuary trust account ending in 5302. See Aframe Decl. Ex. 2 [Doc. No. 15-2]; Compl. ¶ 18(c) [Doc. No. 1-2]. A Certification of Trust and Investment Management Agreement executed on December 10, 2014, covers Conklin's residuary trust account ending in 4000. See Aframe Decl. Ex. 3 [Doc. No. 15-3]; Compl. ¶ 18(d) [Doc. No. 1-2]. An Investment Credit Line Note executed on April 26, 2018, covers Conklin's line of credit

3

account ending in 6000. See Aframe Decl. Ex. 4 [Doc. No. 15-4]; Compl. ¶ 18(e) [Doc. No. 1-2].

A Mortgage and Adjustable Rate Note executed on May 12, 2008, and a Modification

Agreement executed on August 12, 2021, cover Conklin's ARM account ending in 4936. See

Aframe Decl. Ex. 5 [Doc. No. 15-5]; Compl. ¶ 18(f) [Doc. No. 1-2]. A Mortgage and Adjustable

Rate Note executed August 8, 2014, covers Conklin's ARM account ending in 6619. See Aframe

Decl. Ex. 6 [Doc. No. 15-6]; Compl. ¶ 18(g) [Doc. No. 1-2]. An Investment Management

Agreement executed on April 12, 2007, and a Wealth Management Agreement executed on

February 1, 2013, cover Conklin's revocable trust accounts ending in 3000 and 3020. See

Aframe Decl. Ex. 7 [Doc. No. 15-7]; Compl. ¶ 18(h)–(i) [Doc. No. 1-2]. An IRA Trust

Application & Adoption Agreement executed on April 13, 2007, covers Conklin's IRA account

ending in 5000. See Aframe Decl. Ex. 8 [Doc. No. 15-8]; Compl. ¶ 18(j) [Doc. No. 1-2]. An IRA

Adoption Agreement executed by Conklin on June 29, 2009, covers Conklin's IRA account

ending in 7000. See Aframe Decl. Ex. 9 [Doc. No. 15-9]; Compl. ¶ 18(k) [Doc. No. 1-2]. A

Private Banking New Account Agreement executed January 15, 2020, covers Conklin's

checking account ending in 2280. See Aframe Decl. Ex. 10 [Doc. No. 15-10]; Compl. ¶ 18(l)

[Doc. No. 1-2]. A Consolidated Account Agreement executed February 1, 2022, covers

Conklin's checking account ending in 0069. See Aframe Decl. Ex. 11 [Doc. No. 15-11]; Compl.

¶ 18(m) [Doc. No. 1-2]. Finally, a Wealth Management Agreement executed December 18,

2017, covers Conklin's UTMA accounts. See Aframe Decl. Ex. 12 [Doc. No. 15-12]; Compl.

¶ 18(n)–(o) [Doc. No. 1-2]. Specific provisions of these agreements are discussed further below.

    C.  *Procedural Background*

    Conklin filed this action in Suffolk County Superior Court asserting four state law causes

of action against both Defendants: breach of contract, Compl. ¶¶ 218–22 [Doc. No. 1-2], breach

of fiduciary duty, id. ¶¶ 197–208, negligence, id. ¶¶ 209–17, and violation of M.G.L. c. 93A, id. ¶¶ 223–38. Defendants removed the case to this court based on diversity jurisdiction, see Notice of Removal [Doc. No. 1], and subsequently moved to dismiss Conklin's Complaint [Doc. No. 1-2] pursuant to Fed. R. Civ. P. 12(b)(6), see Mot. [Doc. No. 14].

## II.    Standard of Review

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

When a complaint's factual allegations are expressly linked to and dependent on a document, and that document's authenticity is not challenged, "that document effectively merges into the pleadings and the . . . court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998).

## III.    Discussion

### A.  *Claims Against BNYM*

Defendants argue that the breach of contract claim against BNYM must be dismissed because BNYM is not a party to Conklin's agreements with BNY Wealth. Mem. ISO Mot. to Dismiss 11 n.4 [Doc No. 16]. The court agrees.

Conklin alleges that BNYM is liable "even if [BNYM] did not directly sign agreements with the Plaintiff[] or manage the Plaintiff's accounts" because BNY Wealth is BNYM's subsidiary and because BNYM "may collect certain fees under some circumstances." Compl. ¶ 7 [Doc. No. 1-2]. However, under both Massachusetts and Pennsylvania law, a parent company is not liable for the contractual obligations of a subsidiary absent exceptional circumstances not alleged here. See Birbara v. Locke, 99 F.3d 1233, 1237–39 (1st Cir. 1996) (holding plaintiffs did not establish facts justifying corporate parent's liability for damages owed for breach of contract by subsidiary and explaining that "under Massachusetts law, the corporate veil will only be pierced in rare situations"); Electron Energy Corp. v. Short, 597 A.2d 175, 567 (Pa. 1991) ("It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract.").

Here, BNYM is not a signatory to any of Conklin's client Agreements. Moreover, the Investment Management Agreements expressly provide that BNYM "is not a party to, provider of services under, or guarantor, with respect to . . . this Agreement." Aframe Decl. Ex. 1 CM/ECF p. 2 [Doc. No. 15-1]; Aframe Decl. Ex. 3 CM/ECF p. 6 [Doc. No. 15-3]; Aframe Decl. Ex. 7 CM/ECF p. 24 [Doc. No. 15-7]. Consequently, Conklin's claim against BNYM for breach of his Agreements with BNY Wealth fails.

Relatedly, because Conklin has not alleged that BNYM participated in managing the assets in Conklin's accounts, Conklin's additional claims against BNYM must be dismissed. As explained further below, each of Conklin's claims challenge BNY Wealth's conduct in managing the assets in Conklin's accounts, namely the investment of those assets in securities managed, issued, or sponsored by Defendants or their affiliates. However, the Agreements governing those accounts are between Conklin and BNY Wealth and, where the Agreements confer investment

authority, they grant that authority to BNY Wealth. See, e.g, Aframe Decl. Ex. 1 CM/ECF p. 2 [Doc. No. 15-1].

Conklin does not contend that BNYM managed his assets or directly engaged in the conduct he asserts was unlawful. And he has not otherwise alleged circumstances that justify piercing the corporate veil to hold BNYM liable for the conduct of its subsidiary. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619, 233 N.E.2d 748 (1968) ("[C]ommon ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees[.]"). Conklin has thus failed to state tort and statutory claims against BNYM based on BNY Wealth's alleged conduct.

B. *Claims Against BNY Wealth*

1. Threshold Issues

Defendants contend that Conklin's claims are barred by forum selection, dispute resolution, and notification provisions in some of Conklin's Agreements with BNY Wealth. Mem. ISO Mot. to Dismiss 9 [Doc. No. 16].

a. Forum Selection Clause

Defendants contend that Conklin's failure to comply with Pennsylvania forum selection clauses in three of his agreements with BNY Wealth "requires dismissal of his claims arising under the Agreements containing them." Mem. ISO Mot. to Dismiss 10 [Doc. No. 16].

"[T]he threshold question in interpreting a forum selection clause is whether the clause at issue is permissive or mandatory." Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 17 (1st Cir. 2009). Permissive forum selection clauses "authorize jurisdiction and venue in a designated forum, but do not prohibit litigation elsewhere." Id. In contrast, mandatory forum selection

clauses make "jurisdiction and venue . . . appropriate exclusively in the designated forum." Id.
(quoting 14D Wright & Miller's Federal Practice & Procedure § 3803.1 (3d ed. 1998)). Whether
a forum selection clause is permissive or mandatory depends on the specific language of the
contract at issue. Id.

The Investment Management Agreements covering trust accounts ending in 9000, 9010,
and 4000, and the Consolidated Account Agreement covering the checking count ending in
0069, include a Pennsylvania choice of law and forum selection clause that states: "This
Agreement and the transactions arising out of it shall be governed by and interpreted under the
laws of Pennsylvania . . . . The parties agree to submit to the venue of any Pennsylvania state or
federal court for all actions or proceedings arising out of or contemplated by this Agreement."
Aframe Ex. 1 CM/ECF p. 9 [Doc. No. 15-1]; Aframe Decl. Ex. 3 CM/ECF p. 13 [Doc. No. 15-3]
(same); Aframe Decl. Ex. 11 CM/ECF p. 13 [Doc. No. 15-11] (with minor differences).

This language is permissive. The First Circuit has explained that an agreement to "submit
to" a particular forum is "an affirmative conferral of personal jurisdiction by consent, and not a
negative exclusion of jurisdiction in other courts" where the parties "could easily have drafted
the contract to provide for exclusive jurisdiction" in a chosen forum. See Autoridad de Energia
Electrica de Puerto Rico v. Ericsson Inc., 201 F.3d 15, 18–19 (1st Cir. 2000). The parties here
have thus consented to personal jurisdiction in Pennsylvania state and federal courts for all
actions and proceedings arising out of the agreements that contain the forum selection clause.
But there is no language requiring that such actions be brought in Pennsylvania. Cf. Silva v.
Encyclopedia Britannica Inc., 239 F.3d 385, 389 (1st Cir. 2001) (explaining "the word 'must'
expresses the parties' intention to make the courts of [a chosen forum] the exclusive forum for

disputes arising under the contract") (emphasis added). Accordingly, the clause does not bar Conklin from bringing claims arising out of those agreements in this court.

>    b.  Mediation Clause

Defendants argue that Conklin failed to comply with a dispute resolution provision in another Investment Management Agreement that covers Conklin's trust accounts ending in 3000 and 3020, which requires nonbinding mediation as a precondition to bringing suit. Mem. ISO Mot. to Dismiss 9 [Doc. No. 16] (citing Aframe Decl. Ex. 7 CM/ECF p. 6–7 [Doc. No. 15-7]). Conklin argues that the proper remedy for failure to comply with this provision is not dismissal, but an order compelling him to follow the dispute resolution procedures set forth in the agreement. See Opp'n 2 [Doc. No. 25-1].

>    The dispute resolution clause reads:

> This Agreement is subject to the requirement that any dispute, controversy, claim or disagreement between either of the parties to this Agreement arising from or in connection with this Agreement, will first be submitted to nonbinding mediation in accordance with the Commercial Mediation Rules of the American Arbitration Association. The parties agree to participate in good faith in the mediation and negotiations related to the dispute for a period of thirty days commencing with the selection of the mediator and any extension of such period as mutually agreed to by the parties. The parties will share equally in any costs of the mediation. The results of mediation will be non-binding on either party. In the event the dispute is not resolved through mediation, the dispute will be adjudicated in a court of competent civil jurisdiction sitting in the State whose law governs the terms of this Agreement.[2]

Aframe Decl. Ex. 7 CM/ECF pp. 6–7 [Doc. No. 15-7].

---

[2] Elsewhere, this Agreement provides that it "shall be governed by and interpreted under the laws of the state in which the office of Manager where the Account is managed is located." Aframe Decl. Ex. 7 CM/ECF p. 6 [Doc. No. 15-7]. The Agreement designates Mellon Trust of New England, N.A., as Manager. See id. at CM/ECF pp. 2, 9. Defendants acknowledge that this clause provides for venue in Massachusetts. See Mem. ISO Mot. to Dismiss 8 [Doc. No. 16] (citing Aframe Decl. Ex. 7 CM/ECF pp. 6–7 [Doc. No. 15-7]).

"When a contract requires that the parties engage in certain dispute resolution procedures before filing suit, the satisfaction of such procedures is a condition precedent to filing suit." See Taylor v. Grunigen, 2022 WL 1239955, at *17 (D. Mass. Apr. 26, 2022); but see HIM Portland, LLC v. DeVito Builders, Inc., 317 F.3d 41, 44 & n.1 (1st Cir. 2003) (holding dispute resolution clause imposed mediation as a condition precedent to arbitration but declining to reach "the broader, more difficult question of whether the [clause] also establishes a valid condition precedent to the bringing of suit"). Whether a contract requires particular dispute resolution procedures is a question of contract interpretation, and the court's task is to determine the parties' intent, first by looking at the plain language of the provision. See HIM Portland, 317 F.3d at 43–44.

Here, Conklin does not dispute, and the text makes clear, that the dispute resolution provision makes non-binding mediation mandatory before filing a civil action arising out of the Investment Management Agreement containing that clause. The clause imposes non-binding mediation as a "requirement," which parties will engage in "first," i.e. before filing a lawsuit. Aframe Decl. Ex. 7 CM/ECF p. 6 [Doc. No. 15-7]. And the dispute may be resolved through a lawsuit "[i]n the event the dispute is not resolved through mediation." Id. at CM/ECF p. 7. Conklin has not alleged that he complied with the dispute resolution provision before filing this action. Therefore, to the extent Conklin's claims arise out of the management of his trust accounts ending in 3000 and 3020 that are governed by the Investment Management Agreement containing the mediation clause, they are not properly before this court.

However, the mediation clause is not grounds for dismissal of Conklin's Complaint [Doc. 1-2]. The mediation requirement applies only to claims "arising from or in connection with this Agreement." Id. at CM/ECF p. 6 (emphasis added). And Conklin alleges claims based on several

other Agreements with BNY Wealth. See Compl. ¶¶ 84–113 [Doc. No. 1-2]; see also id. ¶ 219

("The agreements and loan instruments form a contract between the Plaintiff and the

Defendants."). Conklin's claims are not barred for failure to comply with the dispute resolution

provision to the extent that those claims arise out of Agreements that do not make mediation a

prerequisite to filing suit.

            c.   Notification of Disagreements Clause

Defendants also contend that Conklin's claims are barred by Notification of

Disagreements clauses in the Investment Management Agreements governing Conklin's trust

accounts ending in 9000, 9010, and 4000, and in a Consolidated Account Agreement governing

Conklin's checking account ending in 0069, which required Conklin to report any error or

disagreement concerning account statements and transaction confirmations for those accounts.

Mem. ISO Mot. to Dismiss 9–10 [Doc. No. 16].

The Notifications of Disagreements clause reads:

> Client will promptly report to Manager any error or disagreement concerning
> Account statements and transaction confirmations, and will provide such
> information as Manager may reasonably request to enable Manager to complete
> any of its reporting and review obligations under applicable law and regulations.
> Any disagreement with respect to Account statements and confirmations must be
> made known to Manager within 90 days after the statement or confirmation is
> received; otherwise, Client will be deemed to have approved the statement and the
> reported transactions.

Aframe Decl. Ex. 1 CM/ECF p. 7 [Doc. No. 15-1]; Aframe Decl. Ex. 3 CM/ECF p. 11 [Doc. No.

15-3] (same); Aframe Decl. Ex. 11 CM/ECF p. 11 [Doc. No. 15-11] (requiring report of

disagreements within 30 days).

These clauses do not bar the claims that Conklin asserts here. Defendants primarily rely

on Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC, 2017 WL 6729854 (E.D.N.Y. Oct.

31, 2017) aff'd 736 F. App'x 274 (2d Cir. 2018), in which the Eastern District of New York

11

concluded that a similar provision barred Plaintiff's claim that Defendants breached a merchant agreement by imposing unauthorized charges, including for a service that Plaintiff had declined. Id. at *15, *18–19; see also Healing For The Abused Woman Ministries v. PNC Merch. Servs. Co., L.P., 2019 WL 4973532 (E.D.N.Y Sept. 30, 2019) (citing Zam & Zam Supermarket v. Ignite Payments, 736 F. App'x 274, 277 (2d Cir. 2018)). But here, instead of challenging specific unauthorized transactions, Conklin alleges that ongoing investment practices breached contractual and legal duties owed to him. See Compl. ¶ 94 [Doc. No. 1-2]. Where Conklin challenges the manner in which BNY Wealth exercised its investment authority rather than particular transactions, the Notification of Disagreements Clause is not grounds for dismissing Conklin's Complaint [Doc No. 1-2].

      2.   Breach of Contract

Conklin alleges that "[t]he agreements and loan instruments form a contract between [Conklin] and the Defendants[,]" Compl. ¶ 219 [Doc. No. 1-2], and that Defendants breached that contract by: (1) using their discretionary authority to buy affiliated funds, (2) with respect to Conklin's IRA accounts, purchasing affiliated funds that are not on a pre-authorization list, (3) using a predetermined program that preferred "underperforming, conflicted, affiliated funds" to invest Conklin's assets despite promising him that BNY Wealth would make individualized assessments of his needs, (4) charging Conklin fees other than those promised in the agreements, and (5) engaging in "self-dealing transactions" rather than managing their funds according to a fiduciary standard. Id. ¶¶ 94, 221. Defendants argue that Conklin's breach of contract claim must be dismissed because the agreements under which his claims arise "repeatedly and extensively disclose and authorize the conduct Plaintiff challenges in the Complaint—[BNY Wealth's] investment in Affiliated Mutual Funds." Mem. ISO Mot. to Dismiss 11 [Doc. No. 16].

12

To state a claim for breach of a written contract, a plaintiff must allege that "a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[] sustained damages as a result of the breach." See Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007). To plead a breach, the plaintiff must allege more than that "the facts [demonstrate a] breach of that contractual relationship." See Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (alteration in original). Rather, the plaintiff must describe "with 'substantial certainty,' the specific contractual promise the defendant failed to keep." Brooks, 480 F.3d at 586.

Conklin points to a promise in the Investment Management Agreements stating that BNY Wealth will not exercise its investment discretion "to purchase, review or vote any securities issued by BNYM, its subsidiaries or affiliates ('BNYM Securities'), and Client acknowledges that [Manager] cannot and will not make any recommendations with respect to BNYM Securities." Aframe Decl. Ex. 1 CM/ECF p. 2 [Doc. No. 15-1] (emphasis added); Aframe Decl. Ex. 3 CM/ECF p. 6 [Doc. No. 15-3] (same); Aframe Decl. Ex. 7 CM/ECF p. 2 [Doc. No. 15-7] (similar with no material differences); see Compl. ¶ 93(c) [Doc. No. 1-2]. Conklin alleges that "Defendants['] purchase of funds managed, issued, or sponsored by BNY Wealth, [BNYM] or other affiliates breached the express terms of its client agreements . . . ." Compl. ¶ 94 [Doc. No. 1-2].

However, the Investment Management Agreements distinguish between "affiliated funds" and funds issued by Defendants and their affiliates, and the Investment Management Agreements authorize investment in the former. The Investment Management Agreements authorize BNY Wealth to "periodically review the Account, purchase, retain and sell securities, monies, financial instruments and other Property, all in accordance with Client's written

13

investment objectives." Aframe Decl. Ex. 3 CM/ECF p. 6 [Doc. No. 15-3]; <u>see also</u> Aframe

Decl. Ex. 7 CM/ECF p. 2 [Doc. No. 15-7] (similar with no material differences); Aframe Decl.

Ex. 1 CM/ECF p. 2 [Doc. No. 15-1] (similar with no material differences). The Investment

Management Agreements also include a disclosure regarding purchases of and the receipt of fees

for investing in affiliated mutual funds:

> In accordance with, or in the absence of, written instructions, Manager will invest
> the [account] Property in such stocks, bonds, notes, mutual funds, collective or
> other pooled investment vehicles, or other property as Manager deems appropriate,
> including, without limitation, investing in or using services relating to mutual
> funds, brokerage services, lending, banking or investment businesses selected by
> Manager. Manager or an affiliate of Manager may have an interest in a company
> that provides a service connected with such investment, and Client acknowledges
> that the usual fees for such service may be received by Manager or an affiliate of
> Manager, and Client consents to this arrangement.

Aframe Decl. Ex. 3 CM/ECF p. 6 [Doc. No. 15-3]; <u>see also</u> Aframe Decl. Ex. 7 CM/ECF p. 2

[Doc. No. 15-7] (with minor differences); Aframe Decl. Ex. 1 CM/ECF p. 2 [Doc. No. 15-1]

(with minor differences).

     The Investment Management Agreements further include a section titled "Affiliated

Funds Authorization/Disclosure," which explains that "Manager will typically invest in vehicles

advised by Manager or an affiliate. Client authorizes Manager to invest any Property of an

Account in one or more vehicles advised by Manager or an affiliate." Aframe Decl. Ex. 1

CM/ECF p. 8 [Doc. No. 15-1]; Aframe Decl. Ex. 3 CM/ECF p. 12 [Doc. No. 15-3]; <u>see also</u>

Aframe Decl. Ex. 7 CM/ECF p. 8 [Doc. No. 15-7]. Further, the disclosure provides that "Client

understands and acknowledges" that BNY Wealth and its affiliates may receive fees "in addition

to Manager's compensation for its services provided under this Agreement" if Manager "or any

of its affiliates is the advisor for any vehicle in which Client's assets are invested, or performs

any other services for the vehicle." Aframe Decl. Ex. 1 CM/ECF p. 8 [Doc. No. 15-1]; Aframe

Decl. Ex. 3 CM/ECF p. 12 [Doc. No. 15-3]; <u>see also</u> Aframe Decl. Ex. 7 CM/ECF p. 8 [Doc. No. 15-7] (similar).

Consequently, Conklin has not stated a claim for breach of contract based on alleged investment of his assets in "affiliated funds." And Conklin has similarly not alleged a breach based on Defendants "engaging in the self-dealing transactions alleged in [his] Complaint" rather than "manag[ing] their funds according to a fiduciary standard" to the extent that such transactions consist of investment in affiliated funds. Compl. ¶ 221(e) [Doc. No. 1-2].

Further, Conklin has not pleaded a breach of the Agreements that cover his IRA accounts based on investment of his assets in affiliated funds. Conklin alleges that those Agreements "specify a list of affiliated funds that BNY Wealth is purportedly authorized to purchase," and that "BNY Wealth purchase[d] affiliated funds that are <u>not</u> on the pre-authorization list[.]" Compl. ¶ 221(b) [Doc. No. 1-2] (emphasis in original).

There are two IRA Adoption Agreements governing Conklin's IRA accounts. <u>See generally</u> Aframe Decl. Ex. 8 [Doc. No. 15-8]; Aframe Decl. Ex. 9 [Doc. No. 15-9]. Those Agreements provide a list of affiliated funds for Conklin to select and state that Conklin "authorizes and approves the initial and ongoing investment of the assets of the . . . Account" into the selected funds. Aframe Decl. Ex. 8 CM/ECF p. 3 [Doc. No. 15-8]; Aframe Decl. Ex. 9 CM/ECF p. 3 [Doc. No. 15-9]. Conklin also checked boxes authorizing investment in a number of unnamed affiliated funds. <u>See</u> Aframe Decl. Ex. 8 CM/ECF p. 3 [Doc. 15-8] (authorizing investment in unnamed Dreyfus funds); Aframe Decl. Ex. 9 CM/ECF p. 3 [Doc. 15-9] (authorizing investment in "Other" affiliated funds). These agreements also state that by signing them, the signatory "authorize[s] [BNY Wealth], or any affiliate . . . to make purchases and sales of Affiliated Mutual Funds shares and to receive payment from the Funds for various services

15

rendered as described above and in each prospectus." Aframe Decl. Ex. 8 CM/ECF p. 4 [Doc. No. 15-8]; Aframe Decl. Ex. 9 CM/ECF p. 5 [Doc. No. 15-9].

      The Agreements do not limit the affiliated funds in which BNY Wealth may invest to those on the list. Instead, the Agreements state generally that "[u]nder the terms of the IRA Account Agreement, BNY Mellon is authorized to invest the assets of [Conklin's] IRA Account in mutual funds, including those mutual funds managed, advised, or administered by BNY Mellon Fund Advisors . . . or by . . . affiliates of the BNY Mellon (collectively referred to as 'Affiliated Mutual Funds')." Aframe Decl. Ex. 9 CM/ECF p. 5 [Doc. 15-9]; Aframe Decl. Ex. 8 CM/ECF p. 5 [Doc. 15-8] (similar). Where the Agreements covering Conklin's IRA accounts broadly authorize the investment of the assets in those accounts in Affiliated Mutual Funds, Conklin has not pled a breach of those agreements.

      Nor has Conklin alleged a breach of contract based on BNY Wealth's or its affiliates' receipt of fees from investing in affiliated funds. By signing the Investment Management Agreements, Conklin acknowledged that that BNY Wealth and its affiliates may receive fees "in addition to [BNY Wealth]'s compensation for its services provided under [the] Agreement" if BNY Wealth "or any of its affiliates is the advisor for any vehicle in which Client's assets are invested, or performs any other services for the vehicle." Aframe Decl. Ex. 1 CM/ECF p. 8 [Doc. No. 15-1]; Aframe Dec. Ex. 3 CM/ECF p. 12 [Doc. No. 15-3]; see also Aframe Decl. Ex. 7 CM/ECF p. 8 [Doc. No. 15-7] (similar). The IRA Adoption Agreements include a similar subsection titled "Affiliated Mutual Funds Fee Disclosures," which provides that "[i]n addition to the investment advisory fee, [BNY Wealth] or any of its affiliates may receive fees or compensation for other services provided to such affiliated funds, including but not limited to transfer agency, shareholder servicing, custody, administration, brokerage services, or

16

distribution services." Aframe Decl. Ex. 8 CM/ECF p. 5 [Doc. No. 15-8]; Aframe Decl. Ex. 9 CM/ECF p. 5 [Doc. No. 15-9].

Conklin alleges that Defendants breached the Wealth Management Agreements by receiving compensation in addition to a monthly fee authorized by those Agreements. See Compl. ¶¶ 101, 105–06 [Doc. No. 1-2]. The Wealth Management Agreements do provide a schedule disclosing monthly fees "for normal services." Aframe Decl. Ex. 7 CM/ECF p. 28 [Doc. No. 15-7]; Aframe Decl. Ex. 12 CM/ECF p. 15 [Doc. No. 15-12] (similar). But those Agreements also provide that "[c]ertain types of investments, such as mutual funds . . . may incur additional expenses," Aframe Decl. Ex. 7 CM/ECF p. 28 [Doc. No. 15-7], and that "affiliated and unaffiliated mutual funds[] charge management fees and incur expenses that are borne by fund investors . . . ." Aframe Decl. Ex. 12 CM/ECF p. 15 [Doc. No. 15-12]. Conklin has thus not alleged a breach of the Wealth Management Agreements based on Defendants' alleged receipt of fees other than the monthly fee prescribed by the fee schedule.

Finally, Conklin has not alleged a breach of contract based on Defendants alleged failure to "make individualized assessments of client needs and trade client funds based on those individualized assessments." See Compl. ¶ 94(c) [Doc. No. 1-2]. The Investment Management Agreements state that BNY Wealth "will periodically review the Account, purchase, retain and sell securities, monies, financial instruments and Property, all in accordance with Client's written investment objectives." See, e.g., Aframe Decl. Ex. 1 CM/ECF p. 2 [Doc. No. 15-1]. To the extent this implies a promise to "trade client funds based on . . . individualized assessments," Compl. ¶ 94(c) [Doc. No. 1-2], BNY Wealth's purchase of affiliated funds is not a breach of that promise where the same provision discloses that BNY Wealth will invest client funds "as Manager deems appropriate," and where the Investment Management Agreements authorize

17

Defendants to purchase affiliated funds. See, e.g., Aframe Decl. Ex. 1 CM/ECF pp. 2, 8 [Doc. No. 15-1].

However, Conklin has pleaded a breach of the Investment Management Agreements covering Conklin's trust accounts ending in 9000, 9010, and 4000 by BNY Wealth where he has alleged that BNY Wealth invested the assets in those accounts in funds issued by Defendants or their subsidiaries and affiliates.[3] Those Agreements promise that "Manager will not . . . exercise [investment discretion] to purchase, review or vote any securities issued by BNYM, its subsidiaries or affiliates ('BNYM Securities')," and "[t]o the extent that BNYM Securities are held in an Account, they will be held in a custodial capacity only." Aframe Decl. Ex. 1 CM/ECF 2 [Doc. No. 15-1]; Aframe Decl. Ex. 3 CM/ECF p. 6 [Doc. No. 15-3]. Conklin has alleged that, in breach of this provision, "Defendants used their discretionary authority . . . to purchase dozens of mutual funds or other funds managed, issued, or sponsored by affiliates of the BNY Wealth and its parent company, [BNYM]." Compl. ¶ 59 [Doc. No. 1-2] (emphasis added); see also id. ¶¶ 54, 75, 94(a), 221(a).

In sum, Conklin has stated a claim for breach of the December 2014 and July 2018 Investment Management Agreements, which cover his trust accounts ending in 9000, 9010, and 4000, against BNY Wealth to the extent he has alleged that BNY Wealth purchased securities issued by BNY Wealth, BNYM, or their affiliates with the assets in those accounts. But Conklin has not stated a claim for breach of contract based on BNY Wealth's investment in affiliated

---

[3] Although the Investment Management Agreement that covers Conklin's Trust Accounts ending in 3000 and 3020 also includes the provision that investment managers will not use their investment authority to purchase securities issued by Defendants and their affiliates, Aframe Decl. Ex. 7 CM/ECF p. 2 [Doc. No. 15-7], Conklin's breach of contract claim based on that Agreement is barred by that Agreement's mediation provision, as discussed above.

securities or Defendants' receipt of additional fees from those investments where Conklin's agreements with BNY Wealth authorize such conduct.

### 3. Tort Claims

Defendants argue that the Agreements between Conklin and BNY Wealth bar Conklin's breach of fiduciary duty and negligence claims. Mem. ISO Mot. to Dismiss 16 [Doc. No. 16]. Specifically, Defendants argue that the Agreements limit the scope of BNY Wealth's fiduciary duty, and that both claims are barred where the duties and conduct underlying both tort claims are the same as those underlying Conklin's breach of contract claim. Id. at 16–17.

### a. Breach of Fiduciary Duty

Conklin alleges that BNY Wealth breached a fiduciary duty owed to him by using its investment authority "to purchase affiliated funds without [Conklin's] informed consent regarding: (a) the purchase of the funds; and (b) the unauthorized incentive fees received, and the 'conflicts of interest' arising from those fees." Compl. ¶ 147 [Doc. No. 1-2].

"A fiduciary relationship is one founded on the trust and confidence reposed by one party in the integrity and fidelity of another." Est. of Moulton v. Puopolo, 467 Mass. 478, 492, 5 N.E.3d 908 (2014). Fiduciary duties may arise as a matter of law where parties are cast in archetypal roles, such as trustee and beneficiary, or based on the facts alleged. UBS Fin. Servs., Inc. v. Aliberti, 483 Mass. 396, 406, 133 N.E.3d 277 (2019). "A claim for breach of fiduciary duty has four elements: 1) existence of a fiduciary duty arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a causal relationship between the breach and the damages." Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005).

Under Massachusetts law, if "the contours of fiduciary duties are defined with reference to the terms of [a] contract, there can be no claim for a breach of fiduciary duty where [the

19

fiduciary's] 'contested action falls entirely within the scope of a contract.'" <u>Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.</u>, 479 Mass. 741, 763, 99 N.E.3d 744 (2018) (citation omitted). Similarly, under Pennsylvania law, the "gist of the action" doctrine "precludes plaintiffs from recasting ordinary breach of contract claims as tort claims." <u>McShea v. City of Philadelphia</u>, 995 A.2d 334, 339 (Pa. 2010). Under this doctrine, "[i]f the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract." <u>Bruno v. Erie Ins. Co.</u>, 106 A.3d 48, 68 (Pa. 2014). "If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which . . . exists regardless of the contract, then it must be regarded as a tort." <u>Id.</u> "A claim for breach of fiduciary duty is thus barred by the gist-of-the-action doctrine if the fiduciary duty alleged is grounded in contractual obligations." <u>Cessna v. REA Energy Coop., Inc.</u>, 258 F. Supp. 3d 566, 592 (W.D. Pa. 2017).

Here, several Agreements limit the scope of BNY Wealth's fiduciary relationship with Conklin. For example, the Wealth Management Agreements governing Conklin's revocable trust accounts and UTMA accounts provide that BNY Wealth "shall be a fiduciary with respect to the discretionary investment management powers set out in the Investment Management Account agreement and the Individual Retirement Trust Account. BNY [Wealth] shall not have any other fiduciary duties or responsibilities to the Client." Aframe Ex. 7 CM/ECF p. 25 [Doc. No. 15-7]; Aframe Decl. Ex. 12 CM/ECF p. 12 [Doc. No. 15-12] (same). Similarly, the Investment Management Agreements state that "Manager will only have those duties specified in [this] Agreement." Aframe Decl. Ex. 1 CM/ECF p. 8 [Doc. No. 15-1]; Aframe Decl. Ex. 3 CM/ECF p.

12 [Doc. No. 15-3]. And as explained above, these agreements permit investment of client assets in affiliated funds and authorize Defendants' receipt of fees from such transactions.

To the extent Massachusetts law applies to Conklin's breach of fiduciary duty claim, that claim is barred. Conklin acknowledges that "[t]he [a]greement[s] contained terms governing the relationship between . . . Defendants" and Conklin and that the Agreements "specifically acknowledged" that BNY Wealth would act as Conklin's fiduciary. Compl. ¶¶ 88–89 [Doc. No. 1-2]. And Conklin's claim is based on the "purchase [of] affiliated funds without [Conklin's] informed consent." See id. ¶ 147. But where the Agreements between the parties define the scope of BNY Wealth's investment authority, expressly permit the purchase of affiliated funds, and limit the scope of BNY Wealth's fiduciary duty to Conklin, the "contested action falls entirely within the scope of a contract." Homeowner's Rehab, 479 Mass. at 763 (citation omitted). And to the extent Conklin's claim is governed by Pennsylvania law, it is likewise barred where the fiduciary duty is created by and grounded in the Agreements, and the Agreements authorize the conduct Conklin challenges. See Cessna, 258 F. Supp. 3d at 592 (W.D. Pa. 2017); Bruno v. Erie Ins. Co., 106 A.3d at 68.

Conklin attempts to distinguish his breach of fiduciary duty claim from his breach of contract claim on the ground that the breach of fiduciary duty claim "relates specifically to not only the failure by the Defendants to carry out their contractual duties, but to the intentional systematic misrepresentations put in place to hide the true nature of the Defendants' conduct . . . ." Opp'n 5 [Doc. No. 25-1]. Conklin alleges misrepresentations regarding "unauthorized compensation and the 'conflicts of interest' created by purchasing affiliated funds." Compl. ¶ 164 [Doc. No. 1-2]; see id. ¶ 226. But this allegation is insufficient to state a

claim for breach of a fiduciary duty where the Agreements simultaneously authorize the purchase of affiliated funds and limit the scope of the fiduciary relationship.

> b. Negligence

To state a claim of negligence under Massachusetts law, a plaintiff must allege that he sustained an injury caused by the defendant's breach of a duty of care. See Bennett v. Eagle Brook Country Store, Inc., 408 Mass. 355, 358, 557 N.E.2d 1166 (1990). Under Massachusetts law, "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." FMR Corp. v. Bos. Edison Co., 415 Mass. 393, 395, 613 N.E.2d 902 (1993). Pennsylvania's gist of the action doctrine bars tort claims when the facts underlying that claim establish that the duty breached is contractual, "i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract." See Bruno, 106 A.3d at 68. However, this doctrine does not bar "a negligence claim based on the actions of a contracting party in performing contractual obligations . . . since it is not founded on the breach of any of the specific executory promises which comprise the contract." Id. at 70 (emphasis added). In that circumstance, "the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed." Id.

Here, Conklin asserts that "Defendants acted negligently in performing their contractual and non-contractual obligations to provide investment advisory services . . . ." Compl. ¶ 214 [Doc. No. 1-2]. This is a legal conclusion that is disregarded for the purpose of determining whether Conklin has stated a negligence claim. See Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013). And Conklin's factual allegations do not support a claim that BNY Wealth acted negligently in performing contractual duties. Instead, Conklin alleges that

BNY Wealth breached alleged promises not to invest Conklin's assets in certain investment vehicles and to make investment decisions according to a fiduciary duty defined by contract. See, e.g., Compl. ¶¶ 147–63. Where Conklin has alleged a breach of contractual promises rather than negligent performance of contractual duties, his negligence claim is barred by the gist of the action doctrine to the extent it is governed by Pennsylvania law. And Conklin's negligence claim is similarly barred by the economic loss doctrine where it is based on an alleged breach of obligations that exist because of the contractual relationship between the parties. See Schaefer v. Indymac Mortg. Servs., 731 F.3d 98, 103 (1st Cir. 2013) (explaining that economic loss doctrine generally prevents recovery in tort of purely economic losses associated with a contractual relationship).

### 4. Chapter 93A

Defendants argue that Conklin's claim under M.G.L. c. 93A must be dismissed because Conklin has not alleged that he provided the prerequisite demand letter listing the specific practices that he challenges. Mem. ISO Mot. to Dismiss 18 [Doc. No. 16].

Massachusetts' consumer protection statute, M.G.L. c. 93A, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Id. § 2(a). Section 9 of Chapter 93A provides that "[a]t least thirty days prior to the filing of" an action under Chapter 93A, "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent." Id. § 9(3). Therefore, "'as a special element' of a Chapter 93A cause of action, the plaintiff's complaint must allege that the plaintiff sent a demand letter to the defendant." O'Connor v. Nantucket Bank, 992 F. Supp. 2d 24, 38 (D. Mass. 2014) (quoting Entrialgo v. Twin City Dodge, Inc., 368 Mass. 812, 812, 333 N.E.2d 202

(1975)). "Massachusetts courts . . . strictly adhere[] to Chapter 93A's demand requirement.

Burns ex rel Off. of Pub. Guardian v. Hale & Dorr LLP, 445 F. Supp. 2d 94, 97 (D. Mass. 2006)

(citing City of Boston v. Aetna Life Ins., 399 Mass. 569, 574, 506 N.E.2d 106 (1987)).

Consequently, a plaintiff's failure to allege compliance with the demand letter requirement

warrants dismissal of a Chapter 93A claim. See O'Connor, 992 F. Supp. 2d at 38 (collecting

cases); see also Rhodes v. Ocwen Loan Servicing, LLC, 44 F. Supp. 3d 137, 142 (D. Mass.

2014) (explaining demand letter requirement is "a jurisdictional prerequisite").

Here, Conklin "concedes that prior correspondence sent to the Defendants does not

conform to the notice requirements of M.G.L. c. 93A." Opp'n 10 [Doc. No. 25-1]. Accordingly,

Conklin's claim under Chapter 93A is dismissed.

## IV.   Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. No. 14] is DENIED as

to Conklin's claim for breach of contract against BNY Wealth for investing assets in the

accounts ending in 9000, 9010, and 4000 in securities issued by BNYM, its subsidiaries, or its

affiliates. Defendants' Motion [Doc. No. 14] is GRANTED as to Conklin's remaining claims

against BNY Wealth and as to all claims against BNYM.

IT IS SO ORDERED.

August 21, 2025                              /s/Indira Talwani
                                            United States District Judge